## STEIN et al. v. GULF PRODUCTION CO.
### No. 9970.

Court of Civil Appeals of Texas. Galveston, June 20, 1934.

Rehearing Denied July 12, 1934.

Cox & Hemphill, C. M. Alderson, and Lewis Fisher, all of Houston (W. A. Keeling, of Austin, of counsel), for appellants.

Peareson & Peareson, of Richmond, and B. C. Clark, Joe S. Brown, and John Broughton, all of Houston (John E. Green, Jr., of Houston, of counsel), for appellee.

LANE, Justice.

On October 29, 1921, Max and Lena Stein, husband and wife, owned 80 acres of land in Fort Bend county, described as follows: "All that certain tract or parcel of land lying and being situated in Fort Bend County, Texas, about 16 miles South East of Richmond, Texas, on the waters of Deer Creek, a tributary of the Brazos River, being the S. E. one half of the North One Fourth of section No. 66 H. & T. C. Survey, Certificate No. 273, fully described by metes and bounds in deed from I. Rheinstrom et al to Max Stein, bearing date Oct. 14, 1919, recorded in Volume 84, page 433 of the Deed Records of Fort Bend County, Texas, to which reference is hereby made."

On the date above mentioned, Max Stein executed and delivered to J. H. P. Davis & Co. his promissory note for the sum of $5,000, which provided for the payment of a 10 per cent. attorney's fee if default was made in the payment of the same when due, etc. To secure payment of said note Max Stein executed and delivered to E. E. Chernosky, trustee, his deed of trust for the use and benefit of J. H. P. Davis & Co., covering, among others, the land above described.

On February 6, 1924, the Supreme Lodge of Slavonic Benevolent Order of the State of Texas brought suit in the district court of Fort Bend county against Max and Lena Stein and one John R. Kubena to recover a certain sum and for a foreclosure of a lien claimed by the plaintiff in that suit upon the same lands covered by the deed of trust executed and delivered by Max Stein to J. H. P. Davis & Co.; said suit being numbered 13293 on the docket of said court.

George Hamman, T. J. Holbrook, and J. W. Hampil, in the capacity of trustees in bankruptcy of J. H. P. Davis & Co., intervened in the suit above mentioned, praying for a recovery against Max Stein of $5,000 due upon the note executed and delivered by Stein to Davis & Co., for interest and attorney's fees, and for a foreclosure of the Davis & Co. deed of trust lien as against all parties to the suit mentioned.

Upon the trial of suit No. 13293 on December 31, 1924, judgment was rendered that interveners, Hamman, Holbrook, and Hampil, as such trustees, should have and recover of and from Max Stein the sum of $6,699.85, with interest on the sum of $6,119.85 of said judgment from date of judgment at the rate of 8 per cent. per annum, and for interest at the rate of 6 per cent. per annum on $580, the remainder of said judgment, and for a foreclosure of the Davis & Co. deed of trust lien on several tracts of land, including the tract involved in the present suit.

Thereafter Max Stein and said trustees in bankruptcy of Davis & Co. entered into an agreement whereby the trustees agreed to accept $5,000 in full settlement of their said judgment.

On October 2, 1924, Max Stein executed and delivered to Meyer & Sorelle a mineral lease covering said 80 acres of land. Among other provisions of the lease are those providing that within ninety days after its date lessees could explore the land with seismograph or other device, and that before the end of the ninety days lessees would indicate to lessor whether they desired to continue to explore the land, with the right to surrender all or any part of the land, but if lessees desired to keep the lease in force, or any part of the land, after the ninety days, they should advise lessor in writing and pay to him the sum of $4 per acre for the acreage retained, and upon such payment lessees should have the exclusive right to drill and operate thereon for minerals, which right should continue for twelve months after the end of the ninety days. Such lease also provided that lessees

could continue the right to successive periods of six months by paying lessor $2 per acre semiannually for the land, *and that the lease should not be prolonged beyond five years without actual operations, and that if operations were not begun within five years from the date of the lease it should terminate.*

After such lease was executed it was presented, as was agreed by the parties thereto, to the Gulf Production Company, which signed it as a party thereto, on the 5th day of November, 1924. And on that date Meyer & Sorelle transferred and assigned to Gulf Production Company all their rights under such lease.

As a prerequisite to the Gulf Production Company entering into the lease contract, said company demanded that the liens against the land held by several parties be discharged, and at the request of Max Stein it, on February 5, 1925, loaned to him $6,500 with which he paid the trustees in bankruptcy of Davis & Co. the sum of $5,000 in satisfaction of their lien upon the land, and other valid liens existing against the land, amounting in all to $6,500.

Evidencing such loan, Max and Lena Stein, on the 5th day of February, 1925, executed and delivered to Gulf Production Company their promissory note for the said sum of $6,500 payable to Gulf Production Company on or before five years after date, carrying 6 per cent. interest payable at maturity to be compounded semiannually and providing for 10 per cent. attorney's fees. The note provided for partial payments to be applied first to the interest, and also provided that failure to pay a specified portion of the taxes during the life of the lease would mature the indebtedness at the election of the holder, and recited that the payment thereof was secured by the deed of trust on said land. At the same time the said Steins executed and delivered a deed of trust, conveying to a trustee the said 80 acres · of land and reciting: " * * * that we, Max Stein and wife, Lena Stein, hereinafter called 'Grantors', being just—indebted to Gulf Production Company, a private corporation organized under the laws of the State of Texas, with its principal office at Houston, Texas, in the sum of Six Thousand Five Hundred Dollars ($6,500.00), as is evidenced by the note of said Grantors, of even date herewith, for the said sum of Six Thousand Five Hundred Dollars ($6,500.00), due on or before five (5) years from date, payable to the order of Gulf Production Company, bearing interest from date at the rate of six per cent (6%) per annum, interest payable at maturity and to be compounded semi-annually, both principal and interest payable at Houston, Texas, said note providing, in effect, that if it is not paid at maturity, in whatever way its maturity may come about, and it is placed in the hands of an attorney for collection, or is collected through the Probate Court, the makers thereof shall pay ten per cent (10%) additional of the principal and interest then due thereon as attorney's fees, and further providing that partial payments may be made on said note at any time prior to maturity, said payments to be applied first to interest then accrued and thereafter to the principal, the payment of which note, according to its tenor and effect, we desire to assure and secure to the said Gulf Production Company, its successors and assigns; in consideration thereof, and for the purposes and trusts hereinafter set forth and declared, and also in consideration of Five Dollars ($5.00) to us in hand paid, the receipt whereof is hereby acknowledged * * *."

In addition to the usual provisions the above instrument contained the following:

"As further security for the payment of said note, the Grantors hereby transfer and assign to Gulf Production Company, its successors and assigns, all the royalties which may hereafter be paid or accrue under that certain mineral lease dated October 2, 1924, recorded in Vol. 104, pp. 1 et seq. Deed Records, Fort Bend County, Texas, and executed by Max Stein to H. A. Meyer and A. C. Sorelle, covering the above described land, and the Grantors hereby authorize said Gulf Production Company, its successors and assigns, to collect and receipt for such royalties, and to sign such division orders as may be necessary in order to collect proceeds from the sale of said royalties which may arise under said lease and after collection to apply such proceeds from the sale of royalties toward the payment of the interest then accrued on said note and the balance toward the payment of principal thereof, until the full amount thereof, including principal and interest, has been paid, when the holder of said note shall execute and deliver to the Grantors a full and complete release of this deed of trust.

"Should the Grantors desire to sell and assign any portion of the royalties provided for in said lease above referred to, Grantors shall be entitled to a release of this instrument in so far as it relates to the royalty sold, upon the payment to Gulf Production Company, its successors and assigns, of that proportion of the note hereby secured that the portion of the royalty sold bears to the whole royalty;

such payment to be applied in the manner above set out.

"Grantors herein further agree to keep fully paid all taxes of every kind or character assessed against the property herein conveyed (except the taxes that may be assessed against seven-eighths (7/8) of the minerals under said land during the time said lease above referred to is in force), and in the event Grantors fail so to do, and suit should be filed against said property for the collection of such taxes, then the legal holder of said note shall have the option to declare said note due and payable, and may immediately, without demand or notice, foreclose the lien of this deed of trust.

"It is expressly agreed and understood that $—— of the indebtedness hereby secured is advanced for the purpose of taking up and extending (it) that certain promissory note for Five thousand dollars ($5,000.00), executed by the Grantors and payable to the order of J. H. P. Davis & Company, dated October 29, 1921, and lien created in the deed of trust from the Grantors herein to E. E. Chernosky, Trustee, dated November 1, 1921, and recorded in Vol. 3, pp. 130 et seq., Deed of Trust Records, Fort Bend County, Texas, and also to take up the judgment in favor of George Hamman, T. J. Holbrook, and J. W. Hampil, Trustees of J. H. P. Davis & Company, Bankrupts, in suit No. 13293, on the Docket of the District Court of Fort Bend County, Texas, styled 'Supreme Lodge of Slavonic Benevolent Order of the State of Texas v. Max Stein, et al.,' wherein said George Hamman, T. J. Holbrook and J. W. Hampil, Trustees, recovered judgment against Max Stein in the sum of Six thousand, six hundred and ninety-nine dollars and eighty-five cents ($6,699.85), which judgment was for the amount of said $5000.-00 note, interest and attorney's fees, and also foreclosed the lien so created by said deed of trust; and (2) those certain four (4) promissory notes executed by Chas. Skalad, dated October 8, 1919, one due November 1, 1916. one due November 1, 1917, one due November 1, 1918, and one due November 1, 1919, payable to P. F. Ward, and secured by the vendor's lien upon the above described land, said notes having been assumed by Grantors herein, and the payment of which, by agreement dated May 31, 1920, between D. R. Peareson, the holder thereof, and Max Stein, having been extended so that the total amount of said notes, including accrued interest, should become due as follows: $186.62 on October 8, 1920, $186.62 on October 8, 1921, $186.62 on October 8, 1922, and $186.62 on October 8, 1923, as shown by said agreement recorded in

Vol. 85, page 397, Deed Records of Fort Bend County, Texas. It is expressly agreed and understood that the Gulf Production Company or other holder of the note hereby secured shall be subrogated to said deed of trust lien. judgment lien and vendor's lien, in so far only as they relate to the eighty (80) acres above described, and said liens are hereby brought forward and merged into this deed of trust for the purpose of further securing the note first herein described.

"The balance of the amount of the note hereby secured has been paid in cash to Grantors."

During the period of five years provided for the life of the lease and before the expiration of each six months' period during said five-year period, Gulf Production Company paid Max Stein $2 per acre, which Stein accepted, which payments by the terms of the lease continued the same in force for the five-year period, without any obligation on the part of the Gulf Production Company to drill or otherwise develop the land. The lease, according to its terms, expired on the 2d day of October, 1929.

After the expiration of the lease, Gulf Production Company demanded of the Steins payment of the note executed and delivered by them to it for the sum of $6,500, which demand was refused.

On September 15, 1930, long after the expiration of the lease by its terms, and its abandonment by the Gulf Production Company, the Gulf Production Company brought this suit against Max Stein and Lena Stein, Rosenberg State Bank, Jacob F. Leff, and others.

Plaintiff, in its third amended original petition upon which it, together with its supplemental petition, went to trial, substantially alleged the matters and things set out in our preliminary statement and sought a recovery against Max Stein and wife upon the note executed by Stein, and for a foreclosure on said 80 acres of land.

As the judgment of the court relative to all defendants and cross-plaintiffs, except Max Stein, has not been appealed from, and as none of such parties are brought before this court in any manner by virtue of the appeal of Max Stein, it becomes unnecessary to describe their several pleadings or the judgments entered relative to them, and we will confine our statement to the pleadings of the plaintiff and Max Stein.

Defendants Max and Lena Stein answered the plaintiff's pleading by general demurrer and general denial, and by special allegations

to the effect that the signature of Max Stein to the lease contract entered into between Max Stein and Meyer & SoRelle, of date October 2, 1924, and later, to wit, on the 5th day of November, 1924, signed by Gulf Production Company, was obtained by false and fraudulent representations, made by Meyer prior to the execution of said lease. They also alleged that they were induced to sign the deed of trust made to secure the note for $6,500 executed and delivered by them to Gulf Production Company by reason of a false representation made by D. C. Proctor, an attorney for said company, to them, that the effect of a certain clause in such deed of trust was to provide that the note should be paid from royalties only; said clause reading as follows: "As further security for the payment of said note, the Grantors hereby transfer and assign to Gulf Production Company, its successors and assigns, all the royalties which may hereafter be paid or accrue under that certain mineral lease dated October 2, 1924, recorded in Vol. 104, pp. 1 et seq. Deed Records, Fort Bend County, Texas, and executed by Max Stein to H. A. Meyer and A. C. SoRelle, covering the above described land, and the Grantors hereby authorize said Gulf Production Company, its successors and assigns, to collect and receipt for such royalties, and to sign such division orders as may be necessary in order to collect proceeds from the sale of said royalties which may arise under said lease and after collection to apply such proceeds from the sale of royalties toward the payment of the interest then accrued on said note and the balance toward the payment of principal thereof, until the full amount thereof, including principal and interest, has been paid, when the holder of said note shall execute and deliver to the Grantors a full and complete release of this deed of trust."

Becoming cross-plaintiffs, defendants alleged in effect that after the signatures of Max Stein to said lease and deed of trust was so fraudulently obtained, and long before the expiration of the five years in which, by the terms of the lease, Gulf Production Company could hold the lease, they requested said company to execute a release of its said lease so fraudulently obtained; that such request was refused; that had such release been executed, as it should have been, they could have gotten for a lease of the land to another party $250 per acre, or $20,000 for a lease of the entire tract; that by reason of such fraud and the later refusal of the plaintiff to execute the requested release, defendants have been damaged in the sum of $1,272,400.

While such answer and cross-action covers 43 pages of the transcript and with the exhibits attached 56 pages, we think the statement made by us thereof is sufficient to present and make clear the issues raised by the answer of defendants.

By supplemental petition, plaintiff presents numerous exceptions to the answer and cross-action of defendants, which appear in the judgment rendered in the case which we will hereinafter consider, as the necessity may arise.

Said supplemental petition also contained a general denial, and specially denied that Meyer was authorized to or did agree that Gulf Production Company would advance to Stein $6,500, which would be repaid only from royalties which might be produced from the land; that if said agreement was made, there was no consideration thereof; that on October 2, 1924, Stein executed a mineral lease to H. A. Meyer and A. C. SoRelle covering said 80 acres, which lease was on November 5, 1924, assigned to appellee. Among other provisions of said lease are those providing that within ninety days after the execution of the lease lessee could explore the land with seismograph or other device, and that before the expiration of said ninety days it would indicate to lessor whether it desired to continue to explore and exploit the land with the right to surrender all or any part of the land, but if lessee desired to keep the lease in force after the said ninety days, it should advise lessor in writing and pay to him the sum of $4 per acre for the acreage retained, and upon payment of said $4 per acre lessee should have the exclusive right of drilling and operating thereon for minerals, which right should continue for twelve months after the expiration of the ninety days; that lessee could continue the said right for successive periods of six months by paying lessors $2 per acre semiannually for said land; that the lease should not be prolonged beyond five years without actual operations; and that if operations were not begun within said five years from the date of the lease it should terminate.

That the above referred to lease also provided that lessee had the right to surrender the lease at any time by tendering to the lessor the sum of $10. The pleading alleged that proper notice was given to Stein within ninety days, together with the payment of $320, whereby the lease was continued in force as to all of the land for twelve months; that before the expiration of each six months' period during the five-year period, lessee paid to lessors the $2 per acre, which payments were

accepted by the lessors, and thereby the said lease was continued in force for the successive periods without obligation to develop; and that by reason of the foregoing, Stein became estopped to contend that appellee was under obligation to develop the land, and, therefore, Stein had no cause of action for nondevelopment, and also that the lease expired according to its terms on October 2, 1929.

The pleading further alleged the subsequent execution and delivery by Max Stein of instruments referring to the mineral lease and requesting that the name of the depository of the annual payments be changed, and concluding with this provision: "Subject to the above alterations the recited lease will remain in force as originally executed." That there were two such instruments executed, one on the —— day of May, 1926, and the other on October ——, 1928, also alleging the execution and delivery by Max Stein to Gulf Production Company of a letter dated October 10, 1928, reciting the existence of the lease on the land and requesting that the rentals or renewals be sent to the Rosenberg State Bank in place of the First National Bank; that Max Stein on November 27, 1925, executed a receipt from Gulf Production Company of a check for $160 as payment in full for delay in drilling for the period beginning December 31, 1925, and ending June 30, 1926, under the mineral lease, and did receive similar sums for the same purpose for the remaining periods of said five years and did execute similar receipts therefor; that by said instruments Stein changed the terms of the original lease, agreed that the lease should remain in full force, except as changed, and did ratify the lease contract, did agree to the payment of rentals in lieu of drilling operations and that appellee was not obligated to drill, and Stein did thereby waive any right which he might have had, if any, to cancel either the mineral lease, the deed of trust, or notes; that if any verbal promises were made in respect to such property, same became merged by the above-described acts of Stein, and such verbal promise could not be the basis of any relief in respect to such instruments; that Stein further ratified the above-mentioned lease, deed of trust, and notes by his subsequent transfer of his one-eighth royalty under the lease; that any subsequent verbal promises in reference to the development of the property was within the statutes of fraud and not enforceable. Appellee also pleaded the statutes of limitation of two and four years against each cause attempted to be asserted by appellants; that appellants could not rescind or cancel either the note or deed of trust, because they had failed and refused to tender the $6,500 which appellee had advanced to take up the said outstanding liens and the $1,600 which appellee had paid to appellants under the lease. Appellee also specially denied that Proctor stated that the $6,500 would be payable out of royalties only and that he had no authority to make any such agreement, and that if any verbal agreements were made between Proctor and Stein in respect to the manner of the payment of said note, such agreement was without consideration and without authority.

The court sustained plaintiff's general demurrer to all allegations of the defendants by which they sought to recover damages against the plaintiff, and upon the refusal of the defendants to amend their pleadings relative to their cross-action, the court dismissed said cross-action. Such action of the court was based upon the conclusion that such allegations, if true, fail to show that plaintiff is liable to defendants in any sum whatever as damages.

The substance of the allegations stricken upon demurrer were, in effect, that after the plaintiff had by virtue of the lease contract of date October 2, 1924, for a valid consideration paid to Max Stein, procured an option to explore the land involved in this suit at any time within five years from the date of said lease contract in the manner alleged, defendant Max Stein, during said five years, had an offer of $250 per acre or $20,000 for a lease of the entire tract of land, that plaintiff was informed by defendant of such offer during said five-year period; that defendant after imparting such information to the plaintiff requested plaintiff to cancel its five-year lease so as to enable Stein to lease the land to the party who had made to him the above-mentioned offer; that Stein as a consideration of such requested cancellation offered to repay to the plaintiff the sum of $6,500 which plaintiff had expended at the request of Max Stein in the purchase of the liens which existed against the land involved in this suit, which said liens had been transferred to and became the property of plaintiff.

All demurrers and exceptions having been disposed of, the cause proceeded to trial before a jury upon the pleadings of the parties relative to the right of the plaintiff to recover upon the note sued upon, and for judgment of foreclosure of the deed of trust signed by Max and Lena Stein on the 5th day of February, 1925, as prayed for by the plaintiff.

After both parties had offered their respective evidence and closed, the court upon mo-

tion of plaintiff instructed the jury to return a verdict against Max Stein for the sum due upon the note sued upon, principal, interest, etc., in favor of the plaintiff, and for a foreclosure of plaintiff's deed of trust lien upon the 80 acres of land involved in the suit against all the defendants. Such instructed verdict was accordingly returned, and approved by the court, and upon such verdict the court rendered judgment for the plaintiff against Max Stein for the sum of $10,000, the amount found by the jury to be due upon the note sued upon, together with 6 per cent. per annum interest thereon from date of judgment until paid. The judgment further decreed a foreclosure of the plaintiff's lien on the property against all defendants, as it existed on the 5th day of February, 1925.

From such judgment and ruling of the court upon demurrer, Max Stein and Lena Stein have appealed.

Appellants filed no motion for new trial, nor assignments of error in the trial court.

We shall first dispose of the contention made by appellants' third proposition, as follows: "The trial court erred in sustaining plaintiff's general demurrer to the cross-action of defendants, Max and Lena Stein, because such cross-action arose out of and was based upon the same facts involved in plaintiff's suit for recovery herein."

We overrule the contention. The undisputed evidence shows that on October 2, 1924, appellant Max Stein executed and delivered to Meyer & SoRelle a plain, unambiguous, easily understood mineral lease covering the 80 acres of land involved in this suit. It provided that lessees should have ninety days to investigate mineral probabilities of the land. Lessees were to notify lessor whether they wished to continue the lease in force for a period of five years. The lease was assigned to appellee Gulf Production Company on the 5th day of November, 1924, one month after it was executed. Max Stein, the lessor, was informed that the lessee desired to keep the lease in force for five years, and it paid to Stein all sums agreed upon to keep the lease in force for five years from October 2, 1924. At the end of said five-year period Gulf Production Company surrendered their lease. The lease contains no provision, either expressed or implied, that the lessee could be called upon to surrender the lease during said five-year period. By no manner of construction could it be held that the lessee, by such lease, was obligated to develop the land. To the contrary, it is specially provided in the lease that it should not be prolonged be-

yond five years without actual operation, and that if operations were not begun within five years from its date, the lease should terminate.

Appellant, however, contends that his signature to the lease was obtained by means of promises made to him by Mr. Meyer that if he would execute the lease he could pay certain indebtedness, amounting to more than $7,500 secured by valid liens on the 80 acres of land. Such items were a deed of trust lien held by the trustees of Davis & Co. to secure the payment of more than $6,699.85 and the other a vendor's lien held by D. R. Peareson for $967. At the time the lease was executed neither Meyer, SoRelle, nor appellee owned either of said liens, and so far as shown by the evidence, neither of said parties contemplated becoming the owner thereof. But as Stein was advised by Meyer that before any operations could be safely had upon the land such liens would have to be discharged, Stein through his attorney, C. F. Stevens, got busy and procured an agreement from the Davis & Co. trustees to accept $5,000 in full payment of their claim, which at that time had been reduced to a judgment for $6,699.85, and not until three months after the lease was executed did appellee take up and become the owner of either of such claims, and from the time of the execution of the lease up to February 5, 1925, both Stein and Meyer knew that neither Meyer, SoRelle nor appellee were in a position to make nor fulfill a promise to see that such claims were paid out of royalties only.

The undisputed evidence shows that the lease in question was prepared on the 1st day of October, 1924, and left with Max Stein for his examination, and that on the next day, October 2, 1924, he executed the same and delivered it to Meyer.

Max Stein testified that he was in the business of leasing land for oil and gas and that he had theretofore been engaged in the purchase and sale of mules; that he was familiar with deeds of trust; that he had executed many such instruments; that he knew what it was to give security for a debt. It was shown that Max Stein was a man active in many lines of business. In the face of all the facts shown, Max Stein testified that on October 1, 1924, Meyer, as agent for appellee, told him that the liens then existing against his 80 acres of land could be paid out of royalties.

H. A. Meyer testified that at no time, either before or after the execution of the lease of October 2, 1924, did he tell Max

Stein that the liens mentioned could be paid out of royalties only.

We think the trial judge was justified in his conclusion that the lease contract was a valid contract, binding the parties thereto, and that since, under its terms, appellee had the right to hold it for five years upon its compliance with such terms, which the undisputed evidence shows it did, it was under no obligation to release or give up the lease during said five-year period at the request or demand of Max Stein, and therefore it is clearly apparent that the cross-action filed by Max Stein presents no cause of action against appellee and that the trial judge did not err in sustaining appellee's general demurrer thereto.

It has been said that in suits to cancel and annul written instruments for fraud, the testimony must be "clear and decisive proof," "clear and satisfactory evidence," "clear and convincing proof," and "clear and precise." American Freehold Land Mortgage Co. v. Pace, 23 Tex. Civ. App. 222, 56 S. W. 377; Marchman v. McCoy Hotel Operating Co. (Tex. Civ. App.) 21 S.W.(2d) 552, 557; Brown v. Palatine Ins. Co., 89 Tex. 590, 35 S. W. 1060; Spencer v. Colt, 89 Pa. 314–319.

In the case first cited it is said: "The expression 'clear and satisfactory,' in the sense in which it is here used, we think should be taken to mean that it should be clear in the sense that the evidence upon which reformation is based is not ambiguous, equivocal, or contradictory, and should be perspicuous and pointed to the issue under investigation; *and satisfactory in the sense that the source from which it comes is of such a credible nature that the court and jury, as men of ordinary intelligence, discretion, and caution, may repose confidence in it.*" (Italics ours.)

We here quote from the Marchman Case expressions peculiarly applicable to the present case: "Since the reformation of the lease sought by plaintiff consists in adding another separate and distinct agreement to those already embraced therein, and the cancellation claimed is for breach of the added agreement, manifestly the proof necessary to make a prima facie case for that relief must be of a more specific character than that ordinarily required for the cancellation of a written instrument as written without adding anything thereto. Plaintiff sought, first, to ingraft another agreement into the lease, and thereby add another covenant on the part of the defendant and then to cancel the lease by reason of the breach of the added covenant. It is a familiar rule that since a forfeiture is a harsh remedy, the right thereto must be clearly established."

■ When the parties, as in the present case, have put in writing stipulations showing the considerations for the execution of the contract, they should not be permitted to show an inconsistent agreement. Coverdill v. Seymour, 94 Tex. 1, 57 S. W. 37; Winkler v. Creedmore (Tex. Com. App.) 256 S. W. 257; Johnson v. Johnson (Tex. Com. App.) 14 S. W.(2d) 805; 17 Texas Jurisprudence, page 830.

■ We now come to a consideration of appellants' contention that the court erred in instructing the jury to return a verdict for the sum due upon the note sued upon, and for a foreclosure of the deed of trust signed by the Steins, on the 80 acres of land and upon the royalties retained by the Steins to secure the payment of said note, in that the evidence as to whether or not appellants were induced to sign the deed of trust by reason of false representations of D. C. Proctor, attorney for appellee, that the effect of that clause in the deed of trust relative to royalties was, in effect, a provision that the amount due on the note was payable out of royalties only.

Max Stein, a vitally interested witness upon whose testimony alone appellants' defense depends, testified that Attorney Proctor prepared the note and a deed of trust for him and his wife to sign, that he read the deed of trust and discovered that there was no provision therein that the note was to be paid out of royalties, and that for that reason he refused to sign the deed of trust and told Proctor that he would not execute the deed of trust unless such provision was inserted therein; that Proctor told him that he could not put such provision in the deed of trust unless he was authorized to do so by Mr. Garrett, that he would talk it over with Meyer and find out if it was the agreement Stein had with Meyer, and that if it was he (Proctor) would put it in the deed of trust, and told Stein to come back the next day, and that on that day Proctor told him that he had talked with Meyer and Garrett and that they told him that it was satisfactory to them to put that clause in the deed of trust; that Proctor then read the deed of trust prepared to him and said, "it is absolutely a fact that this money should be paid out from the royalties only," and that he (Stein) said that was the only way he could repay the money; Proctor then said that one good well would pay the indebtedness in one week; that up-

on such statement he signed the deed of trust.

On cross-examination, Stein was asked if he read the deed of trust, and especially that paragraph relative to the payment of the note from royalties. To such question he answered, quoting from the provisions of the deed of trust, as follows: "Yes, sir, let me have it, please sir; here is what I was interested in: 'To collect and receipt for such royalties, and to sign such division orders as may be necessary in order to collect proceeds from the sale of said royalties which may arise under said lease and after collection to apply such proceeds from the sale of royalties toward the payment of the interest then accrued on said note, and the balance toward the payment of principal thereof, until the full amount thereof, including principal and interest, has been paid, when the holder of said note shall execute and deliver to the grantors a full and complete release of this deed of trust,' and those are what he told me were the controlling terms in this instrument."

Testifying further, he said that he was engaged in writing and taking oil leases and that he had made arrangements with his brother-in-law, Mr. Ralph Seibel, in Galveston, to take up the indebtedness for him.

The note and deed of trust were contemporaneously signed by appellants. The royalty provision in the deed of trust signed by the Steins has been set out on page 873 of this opinion. It is plain, unambiguous, and easily understood by one of ordinary intelligence.

Max Stein, testifying further, said that he knew very well what a deed of trust ordinarily contained; that he had signed a lot of deeds of trust and was acquainted with and familiar with the terms ordinarily used in deeds of trust; that he read the deed of trust signed by him before he signed it; that Proctor read the deed of trust to him; and that he read that clause relative to royalties. He testified that he had been engaged in several lawsuits before he executed the deed of trust.

D. C. Proctor, the attorney for appellee who prepared the note and deed of trust signed by Stein and wife, testified that the clause in the deed of trust relative to royalties (hereinbefore set out) was perfectly clear to him; that at no time or place did he tell any one that that paragraph in which royalties are mentioned or referred to meant that the note which the deed of trust represented should be paid only out of royalties obtained

from the land; that he did not represent to Mr. and Mrs. Stein, or any one else, that the note should not be paid except out of the royalties; that at no time did he represent to any one that the terms of the two papers, the note and deed of trust, meant anything other than the plain language of the two instruments implied, nor did he tell Max Stein that one good well on the land would pay the indebtedness off in a week. He testified that he was not now representing appellee and had not done so since December, 1929.

The undisputed evidence shows that on February 5, 1925, three months after the execution of the lease, the Davis & Co. trustees held a judgment lien to secure payment of $6,699.85 covering the 80 acres of land in controversy, and that D. R. Peareson held a vendor's lien on the same land amounting to $964.37; that upon the request of Max Stein the appellee paid the said trustees $5,000, and they transferred their judgment to appellee, and that at the request of Max Stein appellee also paid D. R. Peareson $964.37 and he transferred his lien to appellee, and appellee also at said time advanced to Max Stein the sum of $535.37, a total of $6,500; that to further evidence his obligation to pay the sum so expended by appellee, Max Stein on said 5th day of February, 1925, executed and delivered to appellee the note and deed of trust sued upon.

The undisputed evidence shows that Attorney Proctor had, prior to the preparation of the deed of trust which Stein executed, prepared and presented to Stein another deed of trust to secure the payment of this note in controversy; that Stein read the deed of trust, understood its terms, and refused to sign it because the clause therein relative to royalties was not satisfactory to him; that he read the deed of trust which he signed, especially that clause therein relative to royalties.

There was no contention by Stein that after he read the royalty clause he was unable to understand it, but he contends only that Proctor told him that the effect of the royalty clause was to provide that the note should be paid out of royalties only, and that, adopting Proctor's interpretation of such clause, he and his wife signed the deed of trust.

Max Stein, as shown, was a vitally interested witness and his testimony as to his lack of understanding of the import of the royalty clause of the deed of trust and as to the statement alleged to have been made by Attorney Proctor falls short of probative

evidence, and in our opinion the trial court did not err in refusing to submit its truth or falsity to the jury and in holding that there was no probative evidence to show that appellants were induced to execute the deed of trust by reason of any false representations made by Proctor.

If, however, we are in error in holding under the evidence that appellants were not entitled to have submitted to the jury for its determination the question as to whether Attorney Proctor made the representations testified to by Max Stein, such error would avail appellants nothing more than a reformation of the judgment to the extent of $535.37, that being the sum paid out by appellee at the request of appellants over and above the judgment and vendor's liens appellee held against the 80 acres of land.

It is therefore apparent that the contention of appellants that the signing and execution of the deed of trust by them was obtained by false representations made by Attorney Proctor, if true, and under the deed of trust void, such fact would not destroy the right of appellee to a foreclosure of its liens by virtue of being a purchaser from the Davis & Co. trustees and D. R. Peareson. It being thus shown that prior to the execution of the deed of trust in controversy the 80 acres of land was already incumbered by valid subsisting liens owned by appellee, hence the signing of the deed of trust by appellant, though induced by the representations alleged to have been made by Attorney Proctor, was damnum absque injuria to appellants except in so far as the deed of trust covered the $535.37 loan above mentioned.

The appellee, plaintiff below, was entitled to a recovery under its pleadings upon its said prior liens, independent of the deed of trust here attacked. Keels v. First Nat. Bank of Groveton, 71 S.W.(2d) 372, decided by this court on March 29, 1934.

For the reasons pointed out the judgment is affirmed by the majority of this court; Associate Justice GRAVES dissenting.

Affirmed.

GRAVES, Justice (dissenting).

Appellants answered the suit for foreclosure with both pleaded and directly testified-to facts which, if true, entitled them to have the deed of trust, the note it secured, and their forerunning but cognate optional lease (had the latter not already expired by its terms), all set aside as having been procured from them by representations amounting in law to fraud whether or not so intended, Wilson v. Jones (Tex. Com. App.) 45 S. W.(2d) 572; they neither denied the utterance nor sought the reformation or construction of any one of them, hence this sole ground for the avoidance thereof in toto from the beginning could not be overcome by marshalling intrinsic provisions of the instruments themselves evidencing contrary agreements on their part, but had to be met on the facts, Cearley v. May, 106 Tex. 442, 167 S. W. 725; Guilder v. Boonton-Pine Brook-New York Bus Co., 110 N. J. Law, 103, 164 A. 316; this was done by appellee's agents flatly denying that any such things as were so charged to have been done by them ever occurred, wherefore an issue of fact that only the jury could resolve was raised, the court being without power to control it through the peremptory instruction given.

There having been a jury in attendance, the findings of fact and law by the court were ineffective because unauthorized. R. S. Article 2208; Rothchild Co. v. Moore (Tex. Com. App.) 37 S.W.(2d) 121; Arlington Heights Realty Co. v. Citizens' Ry. & Light Co. (Tex. Civ. App.) 160 S. W. 1109; Driscoll v. Morris (Tex. Civ. App.) 275 S. W. 196; Robinson v. Lynch Davidson & Co. (Tex. Civ. App.) 1 S.W.(2d) 677.

On the appeal, therefore, under the instructed verdict, the evidence must be viewed in the light most favorable for the appellants, discarding all that is adverse, and if there be left in the record enough of probative force to have justified a finding in their favor, a reversal must follow. Thomas v. Postal Telegraph-Cable Co. (Tex. Com. App.) 65 S.W.(2d) 282.

Moreover, they having raised no question as to the legal purport of the instruments as written, but only asserting them to have been fraudulently obtained—in that, contrary to the prior promises and contemporaneous representations of the appellee's agents in inducing them, they failed to reflect the actual agreement that only the mineral interest in the land should be security for the $6,500 advanced for appellants by the appellee in order to procure a good title thereto —there having further been neither such production nor effort to obtain it on the latter's part, the appellants were not required to return or offer to return this money as a condition precedent to their action to set the instruments aside for the fraud charged. McDonald v. Simons (Tex. Com. App.) 280 S. W. 571; 7 Texas Jur., § 47, pp. 961, 962;

Conn v. Hagan, 93 Tex. 334, 55 S. W. 323; Cearley v. May, 106 Tex. 442, 167 S. W. 725.

While the lease, in terms, ran in favor of Meyer and Sorelle and antedated the other two papers, the evidence aliunde conclusively shows it to have been in effect nothing more than a part of one and the same transaction between Stein and the appellee they evidenced, in order to give the appellee an optional period of ninety days within which to make the geophysical tests it accordingly did of the 80 acres; that in so procuring it Meyer and Sorelle were the leasing agents of, and, as Meyer then advised Stein, acting directly for the appellee, pursuant to its written requests; that no consideration whatever was paid for it at the time obtained, nor any at all until the $6,500 was so paid under all three documents together, after these tests had shown it to be potentially valuable oil land, "in order to protect appellee's leasehold title," obviously, therefore, the fact that the appellee subsequently took a formal assignment of this paper from its two specially empowered agents to thus procure it, and that with at least presumptive knowledge of their having induced it by telling Stein their principal would look alone to its own development thereunder for reimbursement for this $6,500.00—sum then agreed to be paid him—could not convert it into an independent and disassociated undertaking.

As concerns the quantum of proof required to raise an issue over whether or not the fraudulent representations were made as alleged, it was not the province of the lower court—nor is it of this tribunal—to pass upon the weight of the supporting testimony, or the credibility of the witnesses giving it; the authorities relied upon by the appellee on this feature relate to actions on contract rather than those on tort, as was the one at bar; when this distinction is made, it will be perceived that the rule in Texas is as stated; indeed, it is explicitly so declared in the Texas case of American Freehold Land Mortgage Co. v. Pace, 23 Tex. Civ. App. 222, 56 S. W. 377, 391, cited and relied upon by the appellee, in this declaration: "Under the test given, as before stated, the question is whether his evidence was satisfactory; or, in other words, whether he was worthy of belief. The determination of this question was solely the province of the jury. Where his evidence was explicit and to the point, showing that a mistake had been made, the weight to be given such evidence was a question for the jury. They had the right to believe him or disbelieve him, and, having believed him,

it is clear that for the purposes of this case the testimony furnished by him was from a credible source."

So in this instance appellants were "explicit and to the point" in testifying that appellee's agents had first represented to Mr. Stein alone with reference to the lease and later to both with reference to the deed of trust, as inducements to their execution of these instruments, that repayment of this $6,500 loan would be and had been provided for out of royalties only; that they had relied upon such statements when made and in consequence entered into the transactions thereby evidenced and executed the instruments as presented to them, which otherwise they would not have done; since the instruments, as pointed out supra, are merely different spokes in the same wheel, the two must stand or fall together in the light of the respective representations whereby they were thus obtained. These may now be in part recapitulated:

Mr. Stein testifying, first, as to how the lease was obtained from him on October 2, 1924, by Mr. Meyer, leasing agent for the appellee, said:

"He, Meyer, asked: 'Max, in what shape is your eighty acres of land what you own at Long Point?' and I told him that the land was involved; he says: 'If you give me a ninety days optional lease on this certain land, we are going to use, the Gulf Company is going to use their geophysical instruments on it, and if their findings show that it is valuable land,' he says, 'I will get you all the money to clear that indebtedness on that land.' So I believed Meyer, what he said, and I says: 'All right, Henry'; he never did ask me how much he was going to pay me rent; so I asked Meyer: 'How do you expect to get your money back?' and he says: 'We are going to develop the land and take it out from the royalties what will be produced under the land.' I says, 'All right, Henry, give me that lease'; so I went and signed him a lease.

"So, it was the latter part of November, and Meyer says: 'Max, for God's sake, go and make a settlement with the Davis Bank for that land; you have got a valuable piece of land.' I says: 'Henry, you know our agreement what we had before I signed the lease.' He says: 'All right, go ahead and settle it, and I will get you this money.'"

Next, testifying as to what occurred between himself and Messrs. Meyer and Proctor, appellee's leasing agent and attorney, respectively, with reference to the $6,500 loan

and its repayment, in February of 1925, Stein further swore: "So I waited there at Houston at Henry Meyer's office, and Meyer got back, and he says: 'Well, I got you the $6500.00'; he says: 'You telephone to your wife to come over here from Rosenberg,' and he says: 'Then you will both go down to the Gulf office and they will have a deed of trust prepared for you and your wife to sign it.' I told him, I says: 'Henry, I am not going to sign no kind of an instrument unless you put in a clause in there that this money should be paid out from the royalties, and that's the only way I will ever be able to pay that indebtedness,' and he says: 'That's all right; they will fix it up.' So I went down to the Gulf office, and I was inquiring for a lawyer by the name of Gustine, and he wasn't there at that time, and I asked some lady there if they knew if he left any papers to be executed; so she went in at Mr. Proctor's office and introduced me to Proctor and Mr. Proctor says: 'Yes, I have got all the papers here ready for you to execute,' and he handed me a deed of trust, and I read the deed of trust, and I says: 'Judge, I am not going to sign that deed of trust.' He says: 'Why not?' and I says: 'This is not with the agreement which I had with Meyer, before I executed the lease,' and he says: 'I don't know a thing in the world about that, what your agreement was with Meyer; that's all they told me—was to prepare a deed of trust.' So I told him the agreement I had with Meyer before I executed the lease, that this money what should be advanced to pay out that indebtedness should be repaid from the royalties which would be realized from the lease, that otherwise I would not sign it. Well, he said: 'I could not put that kind of a provision in a deed of trust unless I am authorized to do so by Mr. Garrett or someone else, and I will talk it over with Mr. Meyer and find out if that was the agreement, and if it was, I will put it in the deed of trust,' and he said: 'Come back next day.' So, on the following day, I went over there with my wife, and he says: 'Well, I talked with Mr. Meyer and I talked with Mr. L. P. Garrett, and they told me that it was perfectly satisfactory to them to put that clause in the deed of trust,' and he went on then and read it to me, and he says: 'It is absolutely a fact that this money should be paid out from the royalties only,' and I says: 'That's the only way I ever could repay that money,' and he said further: 'One good well will pay the indebtedness in one week,' and on these statements, I went ahead and signed the deed of trust."

Mrs. Stein fully corroborated all material features of these statements by her husband as to what occurred in Mr. Proctor's office with reference to the deed of trust involved, adding as to her having signed it: "I didn't know what kind of a paper I signed; the lawyer, Mr. Proctor, before I signed, he never read anything to me or nothing, but he says: 'That's the paragraph what says this money will come out from the royalties.'"

Mr. Proctor, on the other hand, after first denying generally that he had ever made such statements as the Steins alleged to anybody, thus further responded to inquiries touching the preparation and execution of this deed of trust:

"Q. It is possible that it was the second draft or the third draft as well as it is possible it was the first draft? A. I have no recollection.

"Q. Do you remember how many times Stein came to your office about the matter? A. I don't remember him coming at all.

"Q. If the instrument was signed in your office, you have no independent recollection of it? A. No, sir.

"Q. And you have no independent recollection of his wife coming either, I presume? A. No, sir.

"Q. Now, with reference to Stein, do you remember him at all? A. No, sir.

"Q. You can't remember then whether he was apparently able to know what he was dealing about or not; in other words, Stein is just a name to you, is that right? A. That is all."

Likewise, Mr. Meyer made denials of the specific representations attributed to him by Stein, but admitted the various meetings and negotiations between them concerning this transaction, including one in the interval between Stein's alleged refusal to sign the first deed of trust tendered him in Mr. Proctor's office and his return there that resulted in his signing the one in suit, at which he said of Mr. Stein: "He also insisted on some clause he wanted in this new deed of trust by which he would be permitted to pay off this obligation."

Intrinsically there is nothing impossible or illegal, against public policy, nor, when the surroundings are looked to, anything even incredible about the representations thus testified to. The question is simply whether or not they were true, and, under our system,

it was the exclusive province of the jury to choose between the witnesses so differing about it; it does not answer them to say that appellants were interested witnesses, since the appellee's agents were likewise so, as corporations may only act in that way; neither is appellee's contention that the untutored Stein, whose broken English emphatically tended to corroborate his positive testimony that he had never been to school in his life, was dealing at arm's length with and on an equality in understanding of the transactions he was having with its able attorney and experienced leasing agent; further, both sides at all times material not only knew of Stein's insolvency but of the fact that the land itself was not worth for any other purpose more than one-fourth of the $6,500 advanced upon it, hence neither party could have had from the beginning any reasonable contemplation that the money could ever be returned by him except from the production of oil, and the geophysical showing as to the outlook for that was exclusively in the appellee's possession before it advanced a dollar on Stein's account, or took over any of the papers attending this whole transaction, other than the optional lease it first so obtained as a basis for all the others. 12 R. C. L. p. 295, § 60; 26 C. J. p. 1208; 1 Black on Rescission, p. 197, §§ 80 and 82; Lehman v. Shackleford, 50 Ala. 437.

The lease not having expired by its terms until on or about October 2, 1929, and the appellee not having sought to collect upon the note otherwise than by looking to its payment alone from royalties to be produced from its own development of the land until filing of this foreclosure suit, appellants could not be held to have sooner discovered that it did not intend to abide by the contrary agreement they so alleged and testified it had made with them and secured their execution of these papers upon.

For these reasons the statute of limitation interposed by the appellee was inapplicable. Port Arthur Rice Milling Co. v. Beaumont Rice Mills, 105 Tex. 514, 143 S. W. at page 929, 148 S. W. 283, 150 S. W. 884, 152 S. W. 629.

Two other material errors seem to be apparent upon the face of the record: First, the sustaining of a special exception—thereby cutting off proffered testimony in support of it—of this portion in both appellants' answer and cross-action: "Between the time when said optional lease was obtained and the time when said deed of trust was executed, the said Stein had other opportunities to lease said land at a bonus of $250.00 per acre, had he been free to have done so; that during said time there was great activity in oil, gas and sulphur leases in that vicinity, and that oil then commanded good prices in the market, and that such activity continued for some time thereafter. That the fact that it was generally known that the said 80 acres was tied up with the Gulf Production Company prevented these defendants from considering or negotiating with any other prospective lessees; but other less desirable lands were leased to other major oil companies, Humble, Texas, and others, in that vicinity at a bonus of $150.00 to $250.00 per acre, and that due to the relative location with reference to the Dome, a bonus of $250.00 per acre for the land herein involved would at such time have been a very reasonable bonus and readily obtained."

When these averments are taken as true, as they must be under the sustaining of the exception thereto (Barton v. Farmers' State Bank [Tex. Com. App.] 276 S. W. 177), it affirmatively appears therefrom that appellants, in so executing the written instruments in reliance on the asserted assurances so given them by the appellee, were deprived of the opportunity of leasing this property to others for an aggregate bonus of $20,000; wherefore, whether or not these averments were otherwise relevant, a good cause of action for at least one element of consequent damages was thus alleged.

Second, the exclusion of the testimony of the witness Weinzierl, who had qualified as an expert in geophysical methods, to investigations of that character he had made on the Stein 80 acres during the ninety-day optional period here involved, and of which this appellee had advantage prior to making Stein the $6,500 loan thereon; such testimony being relevant as tending to indicate that drilling on the tract would have produced oil in paying quantities, that Stein might have obtained the declared-upon bonus from others, and that, in the circumstances obtaining at that time, an agreement then made to look to its potential oil value alone as security for a $6,500 advancement was a very favorable one for the appellee.

Under these conclusions the judgment should have been reversed and the cause remanded; this dissent from the affirmance is respectfully entered.